In re ELLISON ASSOCIATES, Debtor.

ELLISON ASSOCIATES, Appellant,

v.

EASTWOOD MANAGEMENT CORPO-
RATION, Ellison Park Enterprises, The
Bowery Savings Bank, and Harris,
Beach, Wilcox, Rubin & Levey, Appel-
lees.

No. 81 Civ. 5841–CSH.
Reorganization Case No. 81 B 11213.

United States District Court,
S.D. New York.

Sept. 27, 1983.

Louis P. Rosenberg, Brooklyn, N.Y., for Ellison Associates.

Skadden, Arps, Slate, Meagher & Flom, New York City, for Eastwood Management Corp., Michael L. Cook, of counsel.

Cadwalader, Wickersham & Taft, New York City, for Bowery Sav. Bank; Terence F. Gilheany, of counsel.

Costello & Shea, New York City, for Harris, Beach Wilcox, Rubin & Levey; Ann R. Goodwin, Frederick N. Gaffney, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff and debtor Ellison Associates (hereinafter "Ellison") appeals from an order of the Honorable Burton R. Lifland, Bankruptcy Judge; which granted defendants Eastwood Management Corp. (hereinafter "Eastwood"), Bowery Savings Bank (hereinafter "Bowery"), and Harris, Beach, Wilcox, Rubin & Levey's (hereinafter "Harris, Beach") motion for summary judgment and dismissed plaintiff's adversary proceeding and Chapter 11 petition. Ellison filed its adversary proceeding against defendants on October 31, 1980, alleging that Bowery had violated the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362, and had committed an act in contempt of the Bankruptcy Court by "causing and permitting" a foreclosure sale of Ellison's alleged property to occur on August 1, 1980, one day after the purported filing of its petition in bankruptcy. For the reasons to be discussed in this opinion, we agree with the Bankruptcy Court's determination that this case contains no genuine issue of material fact and that the defendants are entitled to a judgment of dismissal as a matter of law.[1]

The pertinent facts as set forth by the Bankruptcy Judge in his August 14, 1981 opinion, 13 B.R. 661, at pp. 6–20, are not challenged on this appeal. Ellison, a purported New Jersey limited partnership, claims that it obtained title to the Ellison Park Apartments, a 388 unit rental apartment complex in Rochester, New York (hereinafter the "Property") through its general partner, W.J.C. Realty Co., Inc. (hereinafter "WJC"). Ellison, WJC, Mid-City Management Corp. (hereinafter "Mid-City") and Eastern Development and Investment Corporation (hereinafter "Eastern") are all interrelated entities under the control of Walter Cook. Cook is the central figure in this case, and his lengthy deposition and admissions provided the factual foundation for defendants' summary judgment motion.

For our purposes, the chain of title begins in April, 1977, when A. Bailey and W. Erickson purchased the Property, which was subject to an existing first purchase money mortgage held by Bowery, from an entity known as Ellison Park Apartment Associates. Ellison Park Apartment Associates is totally unrelated to and should not be confused with the debtor in this case. On June 2, 1978, Bailey and Erickson entered into an agreement to sell the Property to Eastern, an entity under Cook's control, for $4.2 million. Bowery's lien was to stay in effect. The following week, Eastern assigned all of its rights in the Property to WJC, another Cook corporation. On June 20, 1978, Bailey and Erickson executed a deed conveying the Property to WJC, which in turn signed a bond and mortgage evidencing an $850,000 loan given by Bailey and Erickson. This loan gave Bailey and Erickson a third purchase money mortgage on the Property, which was junior to a pre-existing mortgage held by Manufacturers Hanover Trust Co. and to Bowery's senior lien.

At closing, only half of the $250,000 due was paid in cash; a $125,000 note, due September 8, 1978, substituted for the remainder. This note was never fully paid. Following closing, the deed, bond and mortgage were not delivered to WJC but instead were placed in escrow with Robert Sylvor (hereinafter "Sylvor"), an escrow

---

1. Just as this opinion was being rendered, defendants filed a motion dismissing plaintiff's appeal to this Court on the grounds of mootness, claiming that since defendant Eastwood has made numerous and costly repairs and capital improvements to the Property it would be impossible to return the parties to their original position. As we are affirming Judge Lifland's decision, we have not addressed the mootness issue in this opinion.

agent. The terms of the escrow agreement signed by the parties on July 31, 1978, provided that Sylvor would hold the instrument until he received written notice from Bailey and Erickson that a certain outstanding tax certiorari proceeding had been settled or until one year's time had elapsed. This year was later extended for an additional thirty days. The escrow agreement further provided that after these conditions were met Sylvor was to release the deed, bond and mortgage to the Pioneer National Title Insurance Company, located in Rochester, and was to return a certain letter agreement between Bailey and Erickson and WJC to Bailey and Erickson. Cook stated during deposition that it was the parties' understanding that WJC had the responsibility to record the deed and to bear the cost of such recording.

Presumably, then, by August 31, 1979, record title and ownership to the Property could have been transferred from Bailey and Erickson to WJC. Nevertheless, they continued to hold themselves out as the owners of the property. For example, in July, 1979, while negotiating a modification and extension of their pre-existing mortgage with Bowery, Bailey and Erickson represented that they were the owners in fee simple. In October, 1979, Erickson conveyed through a recorded deed all of his right, title and interest in the Property to Bailey. Later that month, Bailey negotiated a $700,000 loan with the Commercial Credit Corporation which replaced the second mortgage held by the Manufacturers Hanover Trust Co. At this transaction, Bailey again warranted that he held title subject only to Bowery's first lien on the premises. In this same month, Bailey once again claimed that he was the record title owner of the premises when he executed a mortgage to the First National Bank of Jamestown for $200,000. Finally, in February, 1980, Bailey transferred his title to the Property to an unrelated third party, Grummbasco, Inc., which recorded its deed on February 4, 1980.

Neither debtor nor Cook denied that these misrepresentations took place and were encouraged. Cook admitted that he knew of and acquiesced in Bailey's representing himself as title owner. In fact, Norman Kaye (hereinafter "Kaye"), Vice President of WJC, was present at the Commercial Credit closing and had actual knowledge of the terms of the Commercial Credit Mortgage.

The parties with which Bailey was negotiating had no reason to suspect that Bailey was not in fact the record owner of the Property, since the deed evidencing the transfer from Bailey and Erickson to WJC was still in the hands of Sylvor. Cook testified that he had "forgotten" about the deed just prior to and subsequent to August 1, 1979 and therefore had failed to demand that Sylvor release it from escrow. Cook further admitted that Sylvor, in his opinion, had not violated his fiduciary duty while acting as escrowee.

From September 1, 1979 on Bailey failed to meet his monthly mortgage payments to the Bowery, consisting of principal, interest and real property taxes. On December 6, 1979, Bowery elected to declare the entire unpaid balance due and owing, and through its Rochester counsel, defendant Harris, Beach, filed a lis pendens on the Property and began foreclosure proceedings in the Supreme Court of the State of New York, County of Monroe. Cook admitted that he knew of the state court action on the day of its commencement due to a conversation he had with Letha Miller (hereinafter "Miller"), an employee of Mid-City, which was managing the property. Miller was named as a party to the action pursuant to N.Y. Real Prop. Acts. Law § 1311.[2] She informed Cook of the proceedings and fur-

---

2. Real Property Actions & Proceedings § 1311 provides in part:

"Each of the following persons, whose interest is claimed to be subject and subordinate to the plaintiff's lien, shall be made a party defendant to the action:

"1. Every person having an estate or interest in possession, ...

"3. Every person having any lien or incumbrance upon the real property which is claimed to be subject and subordinate to the lien of the plaintiff."

ther notified him that a receiver, J. Michael Smith, had been appointed by the court to take possession and collect the rents and profits from the Property. Cook admitted that during the more than six months which ensued until the Judgment of Foreclosure Sale was entered in state court, he took no action to intervene in the proceedings. The Foreclosure Judgment, which was never appealed, ordered that the Property be sold on August 1, 1980.

On July 29, 1980, Kaye filed an order to show cause in state court seeking leave for an entity named WJC Realty Co. to intervene in the action as fee owner or, alternatively, for a stay of the foreclosure action. In the order Kaye charged that Bowery had constructive as well as actual knowledge of WJC's ownership and therefore should have named it as a necessary party to the action pursuant to N.Y. Real Prop. Acts. Law § 1311. Kaye based these allegations on the facts that Bowery knew that WJC was in possession, i.e., was managing the property, and that the receiver, upon appointment, had demanded surrender of the security deposits for the property, the tenants lists, the insurance documents and other materials which Kaye claimed were relevant to "ownership, possession, operation and control of the premises." Cook later claimed that Kaye had intended to list the debtor, Ellison, as owner of the premises, rather than WJC, as he did two days later when filing Ellison's bankruptcy petition.

After argument by counsel and submission of papers, Judge Fritsch of the Monroe County Court denied the motion. Almost immediately upon learning of the denial, Kaye filed the instant Chapter 11 petition naming Ellison Associates as owner of the Property. Although the petition was not filed until 5:15 p.m., telegrams were sent to Bowery and Harris, Beach at 4:30 p.m. notifying them that an entity named Ellison *Park* Associates had filed a bankruptcy petition. Cook further claims that a messenger delivered a letter to the Harris, Beach offices the morning of the sale date and that a call was placed to the sale's court-appointed referee. Neither Bowery nor Harris, Beach deny that they received the telegrams or letters, but they claim that they read them after the sale had taken place. Regardless, it is uncontested that an announcement made at the sale informed the audience that an entity which claimed ownership to the property had filed a bankruptcy petition. It was further announced that the sale should go forward.

In an arms-length transaction, Eastwood purchased the property and subsequently conveyed it to Ellison Park Enterprises (hereafter "Ellison Park"). The Ellison Park deed was recorded on September 5, 1980. On October 31, 1980, Ellison filed its adversary proceeding against the defendants in the Bankruptcy Court.

Ellison claimed that by proceeding to execute the foreclosure judgment the defendants violated 11 U.S.C. § 362,[3] which stays the enforcement of judgments against the property of a debtor once a petition for bankruptcy has been filed. The stay provision is self-effectuating; as soon as a petition is filed, enforcement of judgments must cease. Of course, essential to the debtor's theory was that it owned or had some interest in the Property which was sold. Defendants contended, and Judge Lifland found, that title to the Property never passed to Ellison but instead remained in the hands of Bailey and Erickson. Consequently, the sale touched none of Ellison's property and did not violate § 362. For the reasons stated below, we affirm.[4]

---

**3.** 11 U.S.C. § 362 reads in part:
"(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of— ...
"(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title; ..."

**4.** The Supreme Court's opinion in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), particularly as interpreted in *1616 Reminc Limited Partnership v. Atchison & Keller Co.,* 704 F.2d 1313 (4th Cir.1983), has made un-

Ellison claims that it acquired title to the Property from WJC pursuant to an unrecorded bargain and sale deed, without warranties, on June 20, 1978. Inquiry in the court below, therefore, centered on WJC's possession. Defendants asserted several alternate grounds to support their claim that, as a result of the undisputed facts described above, WJC failed to acquire title to the Property and therefore could not have passed it to Ellison. Judge Lifland discussed only four of those grounds, finding it unnecessary to address the remainder. We do likewise.

New York requires an unconditional delivery of a deed by the grantor and an unconditional acceptance by the grantee to effect the transfer of title to property. *Hoffman v. Seniuk*, 88 A.D.2d 954, 451 N.Y.S.2d 191, 192 (1982); *Manhattan Life Insurance Company v. Continental Insurance Co.*, 33 N.Y.2d 370, 372, 353 N.Y.S.2d 161, 308 N.E.2d 682 (1974); *219 Broadway Corp. v. Alexander's, Inc.*, 46 N.Y.2d 506, 414 N.Y.S.2d 889, 891, 387 N.E.2d 1205, 1207 (1979); *Powderly v. Aetna Casualty & Surety Corp.*, 72 Misc.2d 251, 338 N.Y.S.2d 555, 557 (1972); *In the Matter of Caywood Mall, Inc.*, 3 B.R. 579 (W.D.N.Y.Btcy.1980). There is also specific statutory authority for the requirement of a deed. N.Y.GOL § 5–703. It is therefore clear that delivery of a deed to escrow conveys no title to the property until all the terms of the escrow have been strictly fulfilled. *Stein v. Rand Construction Company, Inc.*, 400 F.Supp. 944, 948 (S.D.N.Y. 1975); *Menkis v. Whitestone Savings & Loan Assoc.*, 78 Misc.2d 329, 356 N.Y.S.2d 485, 488 (1974); *Fargo v. Burke*, 262 N.Y. 229, 186 N.E. 683 (1933). Furthermore, the escrowee acts as a trustee for both parties and an agent for neither. He is under a legal obligation which makes him subject to

damages if the escrow is released prior to full compliance. *Stanton v. Miller*, 58 N.Y. 192 (1874). Once full compliance has been met, the deed may, under certain circumstances, be "deemed" delivered to the grantee. *Sando v. Phillips*, 319 S.W.2d 648, 652 (Mo.1959); *Little v. Eaton*, 267 Ill. 623, 108 N.E. 727, 728 (1915). "Deemed" delivery is governed by the intention of the parties as manifest by their actions, their words, or both. *Waters v. Blacksom*, 57 N.M. 368, 258 P.2d 1135, 1136–37 (1953) *cited in Den-Gar Enterprises v. Romeo*, 94 N.M. 425, 611 P.2d 1119, 1121 (1980); *Ten Eyck v. Whitbeck*, 156 N.Y. 341, 352, 50 N.E. 963, 966 (1898); *Bianco v. Furia*, 41 Misc.2d 292, 245 N.Y.S.2d 64, 67–68.

Although modern cases in this country tend to deemphasize the necessity of a physical or actual manual transfer of a deed, looking instead to the actions and words of the parties at the time of delivery or at the circumstances surrounding the execution of the deed, *Ten Eyck*, 156 N.Y. at 352, 50 N.E. at 966; *Bianco*, 245 N.Y. S.2d at 64; *Waters*, 57 N.M. at 368, 258 P.2d 1135; *accord, Schulz v. Young*, 37 N.M. 427, 24 P.2d 276 (1933), in New York a "second delivery" may be made a part of the condition on which delivery of a deed out of escrow is dependent. *219 Broadway Corp. v. Alexander's, Inc.*, 46 N.Y.2d at 571, 572, 414 N.Y.S.2d 889, 387 N.E.2d 1205, *citing, Whitford v. Laidler*, 94 N.Y. 145, 151–52 (1883). In *219 Broadway* it was noted that "[b]y requiring [actual] delivery, the law facilitates the true expectations of the parties by ensuring that the interest in the property is not conveyed until that moment when the parties so intend." 414 N.Y.S.2d at 892, 387 N.E.2d at 1208.

certain the proper standard of review in bankruptcy appeals. *1616 Reminc* found that, at least as applied to the type of state law claim found to be improperly within bankruptcy court jurisdiction in *Northern Pipeline*, the former "clearly erroneous" standard was improper and substituted *de novo* review.

The question is irrelevant here. "Clearly erroneous" is a standard of *factual* review, and, as

noted *infra*, the material facts involved in this appeal are undisputed. This appeal concerns solely questions of *law*. An appellant from an Article I court to an Article III court is always entitled to an independent review of questions of law, *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), which we undertake.

■ With that review of the law in mind, we turn to the contentions of the parties. Based on several uncontested facts and admissions by Cook, defendants first claim that title never passed to WJC because the escrow was abandoned. Formal, express abandonment is not necessary to support such a finding; conduct inconsistent with the escrow is enough. *Miller v. Dealh,* 239 S.W. 679, 685 (Tex.1922); *Green v. Huckstep,* 447 S.W.2d 297, 299 (Mo.1969).

■ The evidence indicates that the escrow was abandoned. The $125,000 note used to purchase the property was never fully paid off, and no payments were ever made on the mortgage held by Bailey and Erickson.[5] Further, Cook admitted he "forgot" about the deed's existence. Cook's R. 3(g) St. ¶ 24. He stated that no demand was made on Sylvor to release the escrow and that it was his opinion that Sylvor had not violated his fiduciary duty by holding the deed in escrow longer than necessary. Cook Dep. Tr. 125, 130, 64. It should be noted that the bond, mortgage and deed remained in escrow long after the institution of this suit in the Bankruptcy Court, almost a full year from the expected August 31, 1979 date of title transfer.

Furthermore, both prior to and on numerous occasions after the alleged transfer of title was to have taken place, Bailey warranted to three lending institutions with which he was negotiating mortgage loans, between July and October, 1979, that he was the owner of the Property in fee simple. Cook admitted that on one of these occasions, Kaye, Vice President of WJC, was present at the transaction and was fully aware of Bailey's statement. In fact, Cook admitted that on two of the occasions Bailey was encouraged to misrepresent his ownership of the property so that refinancing of outstanding loans could be obtained. Cook Dep. Tr. 533, 538. Conduct such as this is totally inconsistent with the desire to claim ownership.

In opposition to this admission, debtor argues that Bailey's asking for a 30-day extension of the escrow agreement in July, 1979, with the transfer of ownership to WJC impending, clearly indicates that the escrow had not been abandoned. We agree that up to this particular point in time, July, 1979, the Court would have difficulty in concluding that the escrow had been abandoned. However, the subsequent totality of experiences necessarily leads us to the opposite conclusion.

In contradiction to prior testimony by Cook, debtor argues that it cannot "be said that Walter Cook acquiesced in the grantors' holding of themselves out as the unbridled owners of the property ... [because] the property was openly managed by Cook's management corporation, Mid-City." Debtor's Memorandum of Law, pp. 13, 14. This denial is directly contradicted by the facts. During the thirteen months between July, 1978 and August, 1979, Mid-City was not the only company to manage the Property. Cook testified that beginning in the early part of 1979 and continuing into July, the Fremar Management Corp., under contract with Bailey and not connected in any way to Cook's enterprises, held these management duties. Cook Dep. Tr. 218.

A second ground argued by defendants is that even if it were determined that the escrow had not been abandoned, neither of two conditions precedent to the delivery of the deed out of escrow, delivery to a specific party in a particular manner and recording of the deed, had been met. The wording of the escrow agreement itself states that upon completion of the necessary conditions, a certain letter agreement between Bailey and Erickson and WJC was to be returned to Bailey and Erickson and that the deed, bond and mortgage were to be turned over to the Pioneer National Title Insurance Company in Rochester, New

---

5. Debtor argues that by agreement payments on this mortgage were deferred until August, 1980. Because the debtor declared bankruptcy before this time, it was never technically in default on this mortgage as the bankruptcy judge found.

Assuming, *arguendo,* that this is true, it does not counter the force of debtor's other actions in convincing the court that the escrow was abandoned.

York. Judge Lifland noted further Cook's prior statement "that according to our escrow extension agreement with Bailey, all the papers should have been recorded but that Bailey asked if we would withhold the recording for another 30 days," Cook Dep. Tr. 447, and further that "WJC would have been responsible for paying the recording fee for the document." Cook Dep. Tr. 132. It would thus appear that Bailey believed that WJC's recording of the deed was synonymous with the transfer of title and that Bailey maintained title to the Property until this had been accomplished. Debtor contends, however, that the recording and transmittal specifications went to the manner of delivery and were not conditions precedent to it. Debtor maintains that "[t]he only condition imposed by the escrow agreement ... was the passage of time following which the escrowee was to make delivery of the documents. His failure to properly carry out his function cannot be refashioned into a default in performance by the grantee." Debtor's Memorandum of Law at 15.

■ Debtor further misconstrues the concept of escrow when it asserts, "Where the grantor delivers the deed in irrevocable escrow where it may under no circumstances be returned, it is clear that delivery was made to an agent of the purchaser." Debtor's Memorandum of Law at 18. This is plainly inconsistent with the law. The escrowee is not deemed an agent of either party. *Stein*, 400 F.Supp. at 948. As the *Stein* court stated, "[p]rior to the happening of any of the conditions upon which the escrow agreement operates, the escrow agent is not empowered to act for either party." *Id.*

■ Even if we were to agree with debtor that recording in this instance was not a condition precedent to the validity of WJC's deed, "the failure of the grantee who purportedly received control and possession of the 'deed' to record it is a factor entitled to some weight by the court on the issue of fact of whether the grantee did receive complete possession of the deed." *Sando v. Phillips*, 319 S.W.2d at 653.

■ Defendants' third argument rests on the requirement that a deed be delivered to effect the transfer of title. *219 Broadway*, 414 N.Y.S.2d at 891, 387 N.E.2d at 1207. Without denying this requirement, debtor argues that actual physical delivery of the deed is not necessary and that the "deemed" delivery fiction should govern in this case.

■ Debtor's argument is meritless. New York case law and statutory authority uphold the necessity of a physical act of transfer. *219 Broadway v. Alexander's, Inc.*, 414 N.Y.S.2d at 892, 387 N.E.2d at 1208; *Stanton v. Miller*, 58 N.Y. at 201. N.Y. Real Prop. Law § 244 provides, "[a] grant takes effect, so as to vest the estate or interest intended to be conveyed, *only from its delivery*, and all the rules of law now in force, in respect of the delivery of deeds, apply to grants hereafter executed." (emphasis added). What is more, the concept of "deemed delivery" argued by debtor as a means of getting around the requirement for actual physical delivery is a protection against wrongful conduct on the part of an escrowee towards his fiduciaries. *Rapp v. Carsdale*, 29 Misc.2d 236, 245, 214 N.Y.S.2d 522 (1960). This doctrine has no application to the facts of this case because there has been no claim by Cook that Sylvor engaged in any wrongful conduct. On the contrary, Cook admitted that Sylvor had not violated the terms of the escrow agreement.

■ As was noted previously, an unconditional acceptance of the deed is also necessary to convey title. *Ten Eyck v. Whitbeck, supra*, 156 N.Y. at 352, 50 N.E. at 966; *Powderly v. Aetna Casualty*, 338 N.Y.S.2d at 555. In this regard, WJC's conduct in forgetting about the deed, its failure to demand the deed's release from escrow, and WJC's failure to properly record it persuades us that WJC did not in fact receive complete posession of the deed.

■ The final ground for finding that WJC failed to pass title to Ellison is that at the time Ellison claims to have been deeded

the Property WJC could not, by the terms of the escrow agreement, have possessed it. N.Y. Real Prop. Law § 245 states that no greater interest can be passed by grant or deed than the grantor possesses "at the time of the delivery of the deed." Ellison claims to have been deeded the Property from WJC soon after the creation of the escrow agreement with Bailey. Yet at this time, the one year and thirty-day waiting period in the agreement had not run and the tax proceeding had not ended. Consequently, by the terms of the agreement itself WJC had no interest in the Property at the time possession is claimed to have passed to Ellison. Therefore, under § 245 WJC could not have passed valid title to Ellison.

■■■ Debtor finally attempts to circumvent the effects of the necessity of a manual transfer of the instrument by the escrow agent to the grantee, the "second delivery," by applying the doctrines of relation back and agency. Debtor claims that, by operation of these doctrines, title passed when the escrow was created, thus avoiding the problems discussed above. The relation back doctrine, when applied, gives the grantee title to the deed as of the time of its execution and not as of the date of delivery. The fiction is generally applied to situations in which a grantor's ability to convey is impeded by some obstacle, such as death, which prevents him from transferring title, *Butler v. Baller's Case*, 76 Eng.Rep. 684 (K.B.1591), and it is only invoked to protect innocent grantees. As Bailey and Erickson, the grantors, have maintained their ability to convey the deed and as the debtor was fully aware of the deed's status, we agree with the lower court that the doctrine is totally inapplicable.

■■■ We similarly remain unpersuaded that WJC acted as an agent for debtor when it purported to purchase the Property. Again, the conduct of WJC leads to another conclusion. WJC first purchased the Property from Bailey and Erickson for $4.2 million. Later it resold it to debtor, for whose benefit it purportedly bought the Property, for $8 million. Cook Dep. Tr. 724. Further, WJC filed a mechanics lien on January 25, 1980 against the Property during the time it allegedly held title for the benefit of the partnership. Interestingly, this lien states in its first paragraph that Ellison Park Associates is the owner in fee simple. Cook Dep. Tr. 449. This conduct is inconsistent with that of a general partner purchasing on behalf of its limited partner. What is more, the Court is asked to consider this an agency relationship on behalf of a limited partner who has filed no papers in New York State allowing it to do business here and has except for the filing of one tax return, failed completely to comply with the New Jersey laws on the formation of limited partnerships.[6] Cook Dep. Tr. 295–96, 353.

■■■ WJC's conduct leads us to affirm the Bankruptcy Court on one other ground. The equitable estoppel doctrine embodies the principle that one who, by his words or actions, represents a certain state of facts to be true and thereby induces another to act to his detriment should be thereafter precluded from denying the existence of such a state of facts.

The doctrine in New York has been defined in terms of six essential elements. The party to be estopped must: (1) demonstrate conduct which amounts to a false representation or concealment of material facts or which gives the impression that the facts are otherwise than as asserted; (2) intend or expect that such conduct will be relied upon by the other party; and (3) have actual or constructive knowledge of the real facts. The party asserting the estoppel must: (1) lack knowledge and the

---

6. New Jersey Uniform Limited Partnership Law § 42:2–6 states in part:

"1. Two or more persons desiring to form a limited partnership shall

"(a) *Sign and swear to a certificate,* which shall state ...

"2. A limited partnership is formed if there has been substantial compliance in good faith with the requirements of paragraph '1' of this section."

Ellison made no effort to comply with the provisions of this section.

means of acquiring knowledge of the real facts; (2) rely on the conduct of the party to be estopped and (3) act in such a way as to prejudicially change its position. *United States v. Bedford Associates*, 491 F.Supp. 851, 866–67 (S.D.N.Y.1980), *quoting, State Bank of Albany v. Fioravanti*, 70 A.D.2d 1011, 1012–13, 418 N.Y.S.2d 202, 203–04 (1979); *In re Delta Motor Hotel of Syracuse*, 10 B.R. 585, 589 (N.D.N.Y.Btcy.1981); *Rosenthal v. National Life Insurance Company*, 486 F.Supp. 1018 (S.D.N.Y. 1980).

█ As estoppel is an affirmative defense, the defendants have the obligation of proving these elements. The record clearly supports its position. Cook admitted that he allowed, even encouraged, Bailey to misrepresent his ownership position in the Property to three lending institutions. This occurred first in July, 1979, when Bailey was renegotiating his mortgage with Bowery, and, later, twice in October, 1979, when Bailey was negotiating a $700,000 loan with the Commercial Credit Company and a $200,000 loan with the First National Bank of Jamestown. These were not inadvertent mistakes but calculated maneuvers by Cook to obtain new financing. He readily admitted that Bailey had better contacts with the banks than he did and was therefore more likely to obtain such financing. As an admitted expert in real estate matters, Cook knew that he was engaging in blatant misconduct bordering on fraud.

█ Cook's conduct, therefore, meets all of the elements required of the party to be estopped. Without denying the foregoing, debtor's papers oppose the estoppel doctrine on the basis that defendants are not those who were injured due to the debtor's and Bailey's misrepresentations. In assessing that defendants had met their burden of proof, Judge Lifland applied the estoppel by silence doctrine, which requires (1) the duty to speak, (2) an opportunity to speak, and (3) an injury to another party as a result of the failure to speak. *In re Pubs, Inc. of Champaign*, 618 F.2d 432, 439 (7th Cir.1980); *Whiting Corporation v. Home Insurance Company*, 516 F.Supp. 643, 646 (S.D.N.Y.1981); *In the Matter of Sidell*, 446 F.Supp. 86, 89 (W.D.N.Y.1978). The duty to speak need not be a purely legal one, *Simmons v. Westwood Apartments Company*, 46 Misc.2d 1093, 261 N.Y.S.2d 736, 740 (1965), *aff'd on other grounds*, 46 Misc.2d 1093, 271 N.Y.S.2d 731, *appeal denied*, 18 N.Y.2d 786, 275 N.Y.S.2d 271, 221 N.E.2d 811 (1966), but may be founded on principles of ethics and good faith. *Columbia Broadcasting System v. Stokey*, 522 F.2d 369 (2d Cir.1975); *Elgie & Company v. "SS. Nederberg"*, 599 F.2d 1177 (2d Cir. 1979). As stated by the *Simmons* court, "[w]hen one party in a relationship with another has an opportunity to speak in order to avoid harm or injury to the other party and fails to do so to the ultimate prejudice of the other party, he will be estopped from relying thereafter on that relationship." Cf. *Armour & Co. v. Celtic*, 294 F.2d 432, 437–38 (2d Cir.1961). In New York, this doctrine is applied whether or not there was an actual attempt to mislead, *Rothchild v. Title Guarantee & Trust Co.*, 204 N.Y. 458, 462, 97 N.E. 879, 880 (1912); *Columbia Broadcasting System v. Stokeley*, 522 F.2d at 369. We agree with the Bankruptcy Judge that this case is an appropriate one for application of the doctrine.

█ The injury to the defendants due to WJC's and Bailey's misrepresentation stems from their subjection to possible liability for violation of § 362, the automatic stay provision of the Bankruptcy Code. Under normal circumstances, if a prospective buyer or creditor at a foreclosure sale heard an announcement that the party whose property was being sold had filed a petition in bankruptcy, the foreclosure sale would be stayed under § 362. The prospective buyer or creditor's recourse under these circumstances would be to await the Bankruptcy Court's proceeding or to file under § 362(d)(2)(A) for a lifting of the stay. Failure to stay such actions against

a debtor leads to contempt charges, as in the instant case.

The facts here, however, are anything but normal. Debtor would have us conclude that its continuous course of conduct inconsistent with ownership did not in any way propel the defendants into the precarious position they faced at the court-ordered foreclosure sale. There is nothing in this record which establishes that debtor had attempted to convey the fact of its alleged ownership to the defendants Eastwood or Ellison Park. Beside Bailey's misrepresentations on warranting title, the record is replete with misstatements made by WJC officials just prior to the foreclosure sale. On the same day that debtor filed its Chapter 11 petition, Kaye filed an affidavit in the foreclosure court in which he swore that WJC Realty Co., a limited partnership, owned the Property. Cook Dep. Tr. 238, 239–40, 554. On this date, debtor also sent mailgrams to defendants Bowery and Harris, Beach stating that the owner of the Property was Ellison *Park* Associates. Defendants' check of the title records would have revealed that Bailey owned the Property and that Ellison Park Associates' ownership had ended in 1977 when it had transferred its ownership of the Property to Bailey and Erickson. Furthermore, during the six month period of time between the initiation of the foreclosure and when judgment was rendered neither WJC nor debtor intervened in the action. Finally, Kaye, who was in Rochester within hours prior to the scheduled foreclosure sale, was not present, nor was anyone else representing the debtor. It was on the eve of the foreclosure sale that Ellison first asserted ownership.

As a consequence of these actions, the record fails to establish that defendants had actual or constructive knowledge of plaintiff's alleged ownership interest in the Property. As stated by the lower court opinion, "estoppel is designed to preclude an owner of property from disputing that another has the title when the true owner's conduct would lead a reasonable man to conclude that another has the title." Bankruptcy Order at 42. We are persuaded that a reasonable man could so conclude.

As a final matter, Ellison asserts that this action was not ripe for summary judgment because of the existence of disputed issues of material fact. However, Judge Lifland's thorough and careful findings of fact rest on well-documented sources, including Cook's own deposition. Ellison has presented no competent evidence—as opposed to arguments, allegations, and speculations—which throws into doubt any of Judge Lifland's findings of fact.

The sole finding which Ellison specifically disputes is material to only one of the four independent grounds discussed above. Ellison argues that Judge Lifland failed to accept as authentic an agreement between Bailey and WJC which extended the time of repayment for the mortgage which Bailey held. The alleged result of the agreement was that WJC was not, as the judge found, in default on this mortgage at the time of the foreclosure sale. Ellison argues that this demonstrates that the escrow had not been abandoned and was still taken seriously. Assuming, *arguendo*, that this is true—although, as discussed above, we do not actually find that it so demonstrates— it has no effect on the three other independent grounds for finding no title transfer nor on estoppel. It is not grounds for reversal.

■ Since WJC never received title to the Property and is further estopped from asserting ownership regardless of its claim to title, it could not have passed title to Ellison. Ellison's adversary suit is therefore without merit, since defendants' foreclosure sale affected none of debtor's property. Summary judgment was properly granted. Further, since Ellison had no assets save its contested claim to the Property, its petition for bankruptcy was properly dismissed under 11 U.S.C. § 1112(b)(1) & (2). Inasmuch as debtor had no assets, it is unlikely to form an effective plan of reha-

bilitation.[7] The order below is affirmed in all respects.

It is So Ordered.

See also Bkrtcy., 54 B.R. 844.

7. Section 1112(b) states in part:

"... on request of a party in interest, and after notice and hearing, the court ... may dismiss a case under this chapter ... for cause, including—

"(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

"(2) inability to effectuate a plan...."

In order to effectuate a plan of rehabilitation, there must be property of the estate of which the debtor has a legal or equitable interest.